# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 2, 2000 Session

## IN RE: THE ESTATE OF LUTHER GASTON GARRETT

**Appeal from the Chancery Court for Fentress County**
**No. P-96-15     Billy Joe White, Chancellor**

---

**No. M1999-01282-COA-R3-CV - Filed October 12, 2001**

---

The testator, a father of six, left a will which devised to one of his children a specific tract of land which, according to the will, was described in an attached survey map. No survey map was attached to the will. Appellant, the recipient of that bequest, disagreed with his siblings about the size of the tract to which he was entitled. After hearing both parties' evidence, the trial court found that the testator's intent was to devise separate seven acre tracts to both Appellant and one of his brothers with the remainder of the estate's property to be divided equally among the six children. Appellant then commenced this appeal. We affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is**
**Affirmed in Part, Reversed in Part and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

Phillips Smalling, Byrdstown, Tennessee, for appellant Keith Edward Garrett.

James P. Romer, Jamestown, Tennessee for appellees Priscilla Louise Wright, Susan Yvonne Wright, Christopher Ross Garrett, Patrick Kent Garrett, and David Denver Garrett.

## OPINION

The testator, Luther Gaston Garrett, the father of six children, left a holographic will which contained only one specific bequest, with the remainder of his estate to be divided equally among his six children. The specific bequest was a tract of land to his son, Keith Garrett, Appellant, and the son's wife, Pamela Garrett. This dispute, between Keith Garrett and his five siblings, arises over how many acres are to be included in that bequest.

At the time of his death in January of 1996, the testator owned approximately one hundred fifty acres of land. The five siblings of Keith Garrett describe the land as consisting of three separate tracts, as follows:

the Falls tract, and Lot 19A of City Lake Estates, known as the Gaston Garrett home tract consisting of approximately 19 acres; the Wayne Davis tract of 100 acres, out of which the 7 acre tract willed to Keith and Pam Garrett and on which they have their house is located, the 7 acre tract on which David Garrett has built his house is located, and upon which the cemetery exists where Gaston Garrett is buried; and the third tract is the Allardt farm on the Taylor Place Road.

The Falls tract and the Wayne Davis tract were contiguous. On that basis, Keith Garrett considered them a single tract and referred to them as the "homestead," a tract of approximately 120 acres. Thus, Keith Garrett takes the position his father owned only two tracts of land: the homestead and the Allardt farm property, which consisted of approximately thirty-eight acres.

Keith Garrett moved onto the Wayne Davis tract in 1974 or 1975. Since 1975, Keith Garrett helped his father maintain the land. Sometime after executing the will in question in 1984, the testator completed a house on the Falls tract. David Garrett began building a house on the Wayne Davis tract, sometime in the 1980s or 1990s.[1]

Shortly before his death, the testator called all his children to his bed side. At that time, he read them his will and gave each a check.[2] The will he read to the children was the holographic will the testator had prepared in 1984. It contained only one specific bequest which stated:

I give, devise and bequeath to my son, Keith Edward, and present wife, Pamela Jo Hurley Garrett, a certain tract of land more particularly described in a survey map attached to this document. The deed to this tract of land is to be processed by my executors, provided I precede the above mentioned in death; however, in case either or both of the above mentioned precede me in death, I will make adjustment or codicil concerning property mentioned and attached. When the above mentioned deed is processed, it is not to be taken as any future part of Keith Edward Garrett's further share in my estate, based on past understanding between us and other considerations.

When the will was found after the testator's death, no survey map was attached thereto. The will named as executors all four of Gaston Garrett's sons. It contained the following *in terrorem* clause:

---

[1]Keith testified David began his house in 1990 or 1991; Keith Garrett's counsel represented in opening statements that David began building the house in 1987; David testified he started it prior to 1982, but also stated elsewhere he started construction in 1989; and the appellees in one filing say he built it in 1988, but on appeal merely claim it was in the 1980s.

[2]The total amount of cash he distributed to each child in the months prior to his death was approximately $15,000.

I would hope that I have reared and raised six children that are reasonable, fair, and unselfish; therefore, any of my heirs that should bring legal process in a Court of law against another heir or heirs of my estate and object to the probate shall be cut off from any share whatsoever in my estate and I further direct that the bequests to such persons shall be considered as part of my residuary estate.

The will was amended once during its existence as evidenced by a handwritten notation dated January 17, 1995 changing the name of a person to contact regarding legal advice or in the event any conflict or difference should arise as to equity or fairness.

After his father's death, Keith Garrett filed a petition to admit will for probate and appointment of executor. The petition named his siblings as respondents. Keith Garrett sought appointment as executor of his father's estate and, requested, *inter alia,* that the will be admitted into probate. He asserted that under the will, he was to "receive one tract and child's portion of the second tract."

Appellant's siblings filed a response requesting that all four co-executors named in the will be appointed executors. The filing also asserted that Keith Garrett's claim of entitlement to a tract was "misleading" because he "was to receive a 7 acre tract where his home is located and a 1/6 interest in the other parcels of real property excluding a 7 acre tract on which the decedent permitted David Garrett to construct his home, which gift to David Garrett was given in about 1988 after Gaston Garrett authored his will in 1984." The siblings requested, among other things, that the court hear proof pursuant to Tenn. Code Ann. § 32-3-101, *et seq.,* if the heirs could not agree to a fair and equitable distribution at the appropriate time. The siblings submitted a tentative plan for distribution of the estate with their filing. This plan proposed in part that Keith and Pam Garrett

will get seven (7) acres where their house is located in accordance with a survey by Andy Potter done in about 1979 which is in the possession of Keith Garrett. This tract is not to be taken as any future part of KEITH EDWARD GARRETT'S further share in the estate, as stated in the will.

David Garrett will receive the house he has built on the Wayne Davis Tract and seven (7) acres surrounding the house in accordance with a gift made by our father prior to the time of his death.

The trial court entered an agreed order admitting the testator's will for probate and administration. All four male siblings were appointed co-executors. Hand written in the lower margin of this order was the following:

By approval of this order counsel for Keith Garrett does not acknowledge the existence of the seven (7) acre survey and it is recognized that an issue exists on this matter.

3

The trial court heard evidence on this matter. At the hearing, Appellant testified that he was claiming 121 acres under the will. This included the land on which his brother David's house, the family cemetery, his father's house, and his own house were located. Appellant stated that in 1984, when the will was written, he was the only child living on the land, and it was meant to be his. He testified:

> In '84, that's what Daddy meant. I was the only one interested. They were all going on with their lives. I have done a whole lot to improve that place, and I don't have any guilt about wanting the whole place. I believe that's exactly what it states.

Pam Garrett, Appellant's wife, testified that some time around 1984, the testator came to her house and told her, "I fixed that place over here so that nobody could ever bother you." She admitted that he did not explain the means he used to effectuate these arrangements.

The eldest son, Chris Garrett, testified that the family was at an impasse about the distribution of the estate, and he requested that the court construe the will and decide on the distribution. He testified that when his father came to him shortly after writing the will:

> one of the major things that he was interested in is protecting Keith's homeplace, Pam's homeplace, and at that time he told me seven acres was the amount of land that he intended to be cut off, but he couldn't give them a deed right now because Keith had a previous marriage that might jeopardize the land, so he wouldn't cut a deed at that time.

Chris Garrett denied that his father had ever expressed an intention that Appellant receive the entire 121 acre tract. He recalled that his father intended to give David seven acres as well. Chris Garrett testified that when his father called all the children to his sick bed to read the will, there was no survey present. He asserted that except for the seven acres to Appellant and seven acres to David, the property was to be divided evenly into sixths.

The second eldest son, Patrick Garrett, testified that his father had intended for Keith to have seven acres. Patrick Garrett recalled seeing a survey map. He stated:

> Just before Dad died. When he gave up the checks out, approximately the 10th of January, I was sitting with him, and he reached in his lock box, and picked the survey up and said, "Keith, here, you will need this survey of your tract." He didn't attach it, but he had it separate and he handed it to Keith.

Patrick Garrett testified that he had not seen the survey since. When asked if he had seen the survey previously, he testified:

> I knew it was there, and paper, and yes it was there. And, in fact, when he called us all together in our last meeting with him, he said, here's Keith, your survey, and put

4

it in the box, and went on with his will, and that was part of his reading and part of the day, and he also indicated David's seven acres to be put to David . . . he gave out the survey along with his monies.

He further testified that both his father and Keith acknowledged that the tract was seven acres.

Priscilla Wright, the fifth eldest child, testified, "Daddy always talked about seven acres." She also stated, "When Daddy read the will to us, when he gathered us up altogether, he held up something, and said, 'Keith will need this, this is his thing.' It was about the seven acres, and then he just stuck it back in there."

The youngest child, Susan White, recalled that her father had mentioned the tract he bequeathed to Keith. She testified:

Well, it's been so long ago, and he wrote the will, I remember him telling me that he wrote a will. I don't remember if that's when he told me about the acreage Keith and Pam should get first, but he did tell me that Keith and Pam would get seven acres before anything else was separated. And then, you know, when he called us all in, that's when he said about David getting seven acres as well.

She confirmed her sister's testimony that their father had held up the survey when he was reading the will to all the children, but she admitted that she had never looked at the survey to see if seven acres were plotted out on it. She also agreed that her father wanted Keith and David Garrett to have seven acres each, stating:

Daddy stressed that for years. He stressed that about Keith getting seven acres and the last years he stressed it for David. That was the main thing he wanted us to do was to make sure they got their seven acres each before we did anything else. If we wanted to own it altogether, or separate it or sell it or whatever we wanted to do with it, he wanted that done first, so they had their homeplaces.

She stated that shortly after her father died, she found the will and the survey was not with it.

David Garrett, the youngest son, testified that he started his house while he was in college, prior to 1982. He stated that his father had never spoken to him about deeding him seven acres, stating:

the only time Dad ever made a reference to me about my place, when he was real sick, almost to die, he said, there was somebody to visit him and asked if I would be there and I sat over on the edge of the property. I just homesteaded and I hope I get my place and Dad raised up his head and he said, "you got it" like that. He never did tell me, I never did worry about the acreage up until he got sick and we knew he was dying.

5

David Garrett offered the following testimony regarding his father's preference for seven acres:

> Where Dad got the number of seven acres was, he heard the Japanese nation had some Imperial monarch or somebody from World War II had divided the whole nation into seven acre plots to give each family and that was what made it take off as a nation, what made them so productive.

David related that he had seen the survey, which Andy Potter had created. He testified that after their father's death Keith told him that their father had given him the survey. David Garrett also testified that he heard Keith acknowledge that his tract was limited to the seven acres surrounding his house. He recalled that Keith had shown him the plat and had fenced the seven acres.

William Campbell, a general sessions court judge who was referred to in the will as a source for advice, testified that Gaston Garrett had mentioned that he intended for "both of the boys" to have their own piece of property and that he had a survey. Mr. Campbell recalled that the boys' plots were "about five acres."

The mother of the six children, Gaston Garrett's former wife, testified that Keith had mentioned seven acres to her several times. She recalled that after

> all the discussions and the children come and told me what they talked about, and never did Keith mention that he was supposed to get all of that over there, and never did they mention that Gaston said anything about a – and I would like to say, Gaston has his faults, but he would never give more to one than another, and to talk to them like he was trying to give them equal shares and then give all that piece to Keith.

Keith was then called as a rebuttal witness. He denied receiving a plat from his father and testified that he never heard his father speak in terms of seven acre plots. He testified that he had only fenced a portion of his property where he had kept a cow.

After hearing the evidence, the trial court found that "Mr. Garrett in no way intended to give Keith Garrett the entire 121 acre tract." The court found clear and convincing evidence that the "surveyed tract" referred to in the will was a seven acre plot and that Mr. Garrett intended to give David Garrett a seven acre tract as well. The court stated that it accepted Keith's offer to mark himself a plot of not more than seven acres and tender a plat thereof within fifteen days to the court and to the other siblings. The court reserved the right to appoint a surveyor to mark the boundaries if the parties could not agree.

Keith moved for an interlocutory appeal which was granted by the trial court and denied by this court. Then, fourteen months after the trial court's ruling, Keith filed a motion for new trial or, in the alternative, relief from order under Rule 59 and 60. This motion asserted that several other witnesses who had discussions about the testator's intent shortly before his death substantiated Keith's claim to the entire 121 acres.

6

The trial court denied Keith's motion, holding that it lacked the authority to reopen the case. However, he was permitted, for the record, to make an offer of proof of evidence he claimed was newly discovered. The offer consisted of testimony from friends of the testator which purportedly corroborated Keith's testimony.

The trial court entered a final order, finding that substantially all the cash of the estate was either distributed prior to the date of the testator's death or used for the administration of the estate, nothing further needed to be done for the administration of the estate, and a final order was necessary for the appeal of the court's prior findings. This appeal ensued.

## I. Standard of Review

The construction of a will is a question of law for the court. *Presley v. Hanks*, 782 S.W.2d 482, 487 (Tenn. Ct. App. 1989). The standard of review for the appellate court is *de novo* with no presumption of correctness. *Estate of Burchfiel v. First United Methodist Church of Sevierville, Tennessee*, 933 S.W.2d 481, 483 (Tenn. Ct. App. 1996); Tenn. R. App. P. 13(d). When, however, the testator's intent is determined by extrinsic evidence, the trial court's findings of fact regarding that evidence are reviewed *de novo* with a presumption of correctness. *Thrailkill v. Patterson*, 879 S.W.2d 836, 841 (Tenn. 1994); *Hanafee v. Jackson Nat'l Bank*, No. 02A01-9201-CH-00004, 1992 WL 137476 at *2 (Tenn. Ct. App. Jun. 22, 1992) (no Ten. R. App. P. 11 application filed).

## II. Keith Garrett's Tract

Keith Garrett argues that the trial court's ruling that he and his wife were entitled to a seven acre tract was clearly contrary to the language of his father's will and to his father's intent. We disagree.

"The basic rule in construing a will is that the court shall seek to discover the intention of the testator, and will give effect to it unless it contravenes some rule of law or public policy. That intention is to be ascertained from the particular words used, from the context and from the general scope and purpose of the instrument." *Daugherty v. Daugherty,* 784 S.W.2d 650, 653 (Tenn. 1990). A will must be interpreted in light of the circumstances existing at the time of its execution and in light of its general purpose. *Id.* Every word used by the testator is presumed to have some meaning. *Id.*

> Where the language of a will is plain and unambiguous, extrinsic evidence is not admissible to vary, alter or contradict the terms of the will. *Frazier v. Frazier*, 430 S.W.2d 655, 659 (Tenn. 1968); *Eslick v. Friedman*, 235 S.W.2d 808 (Tenn. 1951); *Green v. Lanier,* 456 S.W.2d 345 (Tenn. App. 1970). Extrinsic evidence of the testator's intent is admissible, however, to resolve latent ambiguities. *Sadow v. Solomon,* 319 S.W.2d 83, 85 (Tenn. 1958); *Holmes v. Roddy,* 144 S.W.2d 788 (Tenn. 1940). A latent ambiguity is defined as one where the equivocality of expression, or obscurity of intention does not arise from the words themselves, but from the

ambiguous state of extrinsic circumstances to which the words of the instrument refer, and which is susceptible of explanation by the mere development of extraneous facts, without altering or adding to the written language, or requiring more to be understood thereby than will fairly comport with the ordinary or legal sense of the words and phrases made use of.[3] *Id*. at 789

*In re Will of Leitsinger*, No. 01A01-9209-PB-00361, 1993 WL 190916 at *2 (Tenn. Ct. App. June 4, 1993) (no Tenn. R. App. P. 11 application filed); *Greer v. Anderson*, 36 Tenn. App. 507, 509-16, 259 S.W.2d 550, 551- 53 (1953). Extrinsic evidence, to be admissible, must show surrounding circumstances at the time of the execution of the will, rather than at some later date. *Locke v. Davis*, 526 S.W.2d 455, 457 (Tenn. 1975).

The language of Mr. Garrett's will itself is not unclear or uncertain. The clear language of the will referred to a "certain tract of land more particularly described in a survey map" which the will said was attached. When the will was discovered, the survey was not attached. Therefore, the ambiguity arose due to the "extrinsic circumstances to which the words of the instrument refer," i.e., the fact that no survey was attached to the will. This created a latent ambiguity. We find no error in the trial court's decision to hear evidence to determine the testator's intent regarding the extent of the testator's bequest to Keith.

Keith contends that the testator only owned two tracts of land, the 121 acre tract on which his home, David's home and the testator's home were all located, and a separate 38 acre tract. Pointing to his and his wife's testimony that the testator wanted to ensure that they kept their homeplace, Keith maintains that the will's devise of a "certain tract" could only mean the 121 acres on which his house was situated. We find this argument unpersuasive.

Obviously, the testator meant to give Keith and Pamela Garrett something above and beyond an equal share of his total estate, as evidenced by the fact that the bequest to them is the only individual bequest in the will. However, we do not find that the testator intended to give them the entire one hundred twenty one (121) acres, leaving only a 38 acre tract for division among all his children.

---

[3]In contrast,

[a] patent ambiguity stems from uncertainty in the language of the will itself, In re Will of Bybee (Bybee v. Westrick), 896 S.W.2d 792, 793 (Tenn. Ct. App. 1994); Coble Sys., Inc. v. Gifford Co., 627 S.W.2d at 362, and is apparent on the face of the will. See 4 William J. Bowe & Douglas H. Parker, Page on the Law of Wills § 32.7 (rev. 3d ed. 1961). It involves an ambiguous term, see Union Planters Corp. v. Harwell, 578 S.W.2d 87, 92 (Tenn. Ct. App. 1978), that cannot be clarified by considering extraneous facts.

Jacobsen v. Flathe, No. 01A01-9511-CH-00510, 1997 WL 576339 at *2, n.3 (Tenn. Ct. App. Sept. 17, 1997) (no Tenn. R. App. P. 11 application filed).

8

First, the record shows that the testator owned three tracts of land, not two. Janet Garrett conveyed two separate tracts of land to the testator on April 1, 1972. These tracts included property "on the north side of the highway between the Allardt and the Taylor Place" consisting of approximately thirty-eight acres and a one hundred acre tract north of White Oak Creek. In addition, Harold Walker conveyed Lot 19A of City Lake Estates, consisting of approximately 19 acres, to the testator on January 15, 1981. According to maps in the record, the testator's home was on Lot 19A, and Keith and David Garrett's houses were located on the White Oak Creek tract.

Second, the testator's use of the words "a certain tract of land more particularly described in the survey map attached" is inconsistent with an intent to convey in its entirety any parcel owned by testator. Had the testator intended to convey an entire tract, he easily could have referred to it by its common description (e.g., City Lakes Estate tract) or by the deed which conveyed it to him. No survey would have been needed to describe the extent of the bequest, and a copy of a deed could have served as the defining document.

Third, the evidence that the testator was concerned about dividing his estate fairly among his children is convincing. The testator's former wife testified that it would have been uncharacteristic of the testator to favor one child over the others by bequeathing to Keith Garrett one hundred and twenty one (121) acres and allowing him to split the remaining thirty five (35) with his five siblings. The will itself expressed the testator's hope that he "raised six children that are reasonable, fair, and unselfish" and directed the executors to provide "equal and fair share[s]" of his estate to the two daughters. In addition, the testator divided his currency equally among his six children before his death.

Finally, although the testimony is inconsistent among the siblings about whether they saw a paper they thought was the survey, the trial court could have accredited those witnesses who say the survey was present at their bedside meeting with their father. It was later missing. A number of witnesses testified that Keith had acknowledged in the past that his father intended to leave him seven acres and his house.

We have determined that the testator intended to give Keith and Pam Garrett a tract of land in addition to Keith's one sixth interest in the residuary estate. We have also determined that it was not the testator's intent to give Keith the entire 121 acre tract (composed of two separately-deeded parcels) that Keith claims was his father's intent. Absent further clarification in the language of the will, the trial court was correct in considering other evidence of the testator's intent. We find no evidence to support Keith's contention that his father intended that he receive 121 acres other than Keith's and Pam's testimony regarding statements by testator. Those statements are less than conclusive as to the amount of land he intended to leave to Keith and Pam. For example, the testator's bare assurance that he had "taken care of" Keith and Pam Garrett provides no greater support for Keith's claim to one hundred and twenty one (121) acres than it does for the other siblings' position.

9

As to the size of the tract, each of the other five siblings and their mother testified that the testator had intended to bequeath Keith seven acres. Some witnesses testified that Keith had acknowledged the seven acre tract in the past. Mr. Campbell, the testator's legal advisor, recalled that the testator intended to leave Keith a tract of "about five acres." Neither he nor the children's mother had anything to gain from this testimony. The trial court had the opportunity to observe each of the witnesses and weigh their credibility. This court must give considerable deference to the trial judge's findings regarding the weight and credibility of any oral testimony received. *Townsend v. State*, 826 S.W.2d 434, 437 (Tenn. 1992); *Jones v. Hartford Accident & Indem. Co.*, 811 S.W.2d 516, 521 (Tenn. 1991). In light of the above mentioned evidence, we cannot say the trial court erred in determining that the testator intended to devise to Keith and Pamela Garrett no more than a seven acre tract containing their home.

## III. David Garrett's Tract

The trial court's ruling granting a seven acre plot of land to David Garrett, however, is more problematic. The trial court found "Mr. Garrett, by his acts, showed his intention to give David 7 acres and Keith 7 acres." The will makes no mention of a separate bequest to David Garrett. Unlike Keith Garrett, David is only one of the residuary beneficiaries along with his siblings. With regard to the size of the "certain tract" of land bequeathed to Keith Garrett, the court's role was to interpret the intent of the testator, with the starting point being the language of the specific bequest in the will. *Daugherty*, 784 S.W.2d at 653. There is simply no such starting point for any bequest to David.

The intent of the testator must be ascertained "from the particular words used, from the context and from the general scope and purpose" of the will. *Daugherty*, 784 S.W.2d at 653. A court must determine the testator's intent "from what he has written and not from what it is supposed he intended." *Martin v. Taylor*, 521 S.W.2d 581, 584 (Tenn. 1975). Consequently, a court cannot "make a new will or bequest for a testator but must construe what the testator has written and published." *In Re Estate of Jackson*, 793 S.W.2d 259, 261 (Tenn. Ct. App. 1990).

We find nothing in the will which justifies a finding that the testator intended for David Garrett to take the seven acre plot on which his house was located. None of the evidence in support of David Garrett receiving the seven (7) acre tract showed that the testator intended to bequeath David a separate tract of land at the time the will was executed. *Locke*, 526 S.W.2d at 457. "It is not our role to guess at a testator's intentions based on what the parties suppose the testator might have intended but never put in writing." *Martin v. Hale*, 167 Tenn 438, 442, 71 S.W.2d 211, 212 (1934); *Jacobsen*, 1997 WL 576339 at *6 (citing *In re Walker*, 849 S.W.2d 766, 768 (Tenn. 1993)). The testator wrote his will in 1984 and made no specific bequest to David. He had every opportunity to revise his will to provide a specific bequest to David like he made for Keith, but he did not. In fact, the testator made revisions in 1995, many years after David began construction of the home, and still failed to make a provision regarding a grant to him of that property. Even at the time he read his will to his children, he did not amend the will. The court cannot read something into a will which is left out. Because the will makes no specific bequest of land to David Garrett, there was no basis in the language of the will for deciding that Gaston Garrett intended such a separate bequest.

10

Accordingly, we find no basis for a determination that the testator bequeathed seven acres and a house to David Garrett via the will.

However, David and the other appellee siblings do not argue that their father made a testamentary gift of the land to David, but, instead, make several alternative arguments to uphold the grant to David. First, they assert that the trial court's order dividing the real property constituted a recognition or finding that Gaston Garrett had given David his house and seven acres earlier. Thus, they characterize the trial court's ruling as "upholding a parol gift of a tract with his house on it to David as reflective of the condition of the Gaston's estate at the time of his death." Second, David bases his claim on several Tennessee cases dealing with a parol[4] gift of land followed by adverse possession "provides at least a defensive title to real property." He cites *Mercy v. Miller*, 25 Tenn. App. 621, 166 S.W.2d 628 (1942) and *Choate v. Sewell*, 142 Tenn. 487, 221 S.W. 190 (1919) in support of this argument. The third theory argued for upholding the award to David is the agreement among David and the other appellee siblings that this would be a fair and equitable distribution.

The trial court did not specify the legal basis for its ruling, but simply stated:

In keeping with Exhibit 1[5] filed in the cause and in keeping with the evidentiary proof of the intention and actions of the Testator, Luther Gaston Garrett, and also consistent with statements of the brothers and sisters of David Garrett, the court hereby divests the heirs of Luther Gaston Garrett . . . of title and vests title consistent with Exhibit 1 in this cause in David Denver Garrett and his wife Paula . . .

We first turn to the argument under the first two theories, that the court's order should be upheld because the grant to David was a valid parol gift or a parol gift accompanied by seven years of adverse possession. Under either theory, the party claiming the gift was required to show there was a valid gift.

A promise to make a gift is not a gift. *McAdoo v. Dickson*, 23 Tenn. App. 74, 126 S.W.2d 393, 402 (1938). In fact, an oral contract to devise lands is within the Statute of Frauds and unenforceable. *Goodloe v. Goodloe*, 116 Tenn. 252, 92 S.W. 767 (1905); *Williams v. Buntin*, 4 Tenn. App. 340 (1927); *Quirk v. Bank of Commerce & Trust Co.*, 244 F. 682 (6th Cir. 1917).

There are two essential elements to a gift: donative intent and delivery. *In Re Estate of Bligh*, 30 S.W.3d 319, 321 (Tenn. Ct. App. 2000). To accomplish delivery, the donor must relinquish all rights of control over the gifted property. *Yale Univ. v. Fisk Univ.*, 660 F. Supp. 16 (M.D. Tenn.

---

[4]Parol is defined as "a word; speech; hence, oral or verbal; expressed or evidenced by speech only; as opposed to by writing or by sealed instrument." BLACK'S LAW DICTIONARY 1116 (6th ed. 1990).

[5]Exhibit 1 was a survey David Garrett had made which split off the seven acres on which his house was located from the rest of the Wayne Davis tract. The survey was made in 1996 by Andrew Potter.

1985). The party claiming the gift has the burden to establish those elements by clear, cogent and convincing evidence. *Bligh*, 30 S.W.2d at 321. Any doubt must be resolved against the gift. *State ex rel Teague v. Home Indem. Co.*, 59 Tenn. App. 518, 442 S.W.2d 276 (1967). In particular, every fact necessary to show a parol gift of land must be ample, clear and convincing to sustain such gift. *Mercy v. Miller*, 25 Tenn. App. 621, 166 S.W.2d 628 (1942).

The delivery requirement is met, in the context of real property, by delivery of a deed. *Leadford v. Leadford*, 3 Tenn. Civ. App. 502 (1912); also THOMPSON ON REAL PROPERTY, THOMAS EDITION § 88.15(b)(1) (David A. Thomas, ed. 1994) ("A gift of real property is delivered by delivery of the deed."). The effect of valid delivery is to place the gifted property under the control and dominion of the donee. Until such delivery is validly accomplished, a gift may be revoked by the donor; once it is accomplished, the donee's title and right to possession become irrevocable.

The appellees' reliance on the theory of parol gift coupled with adverse possession does not obviate the need to prove that a gift actually occurred. In *Walker v. Moore*, 745 S.W.2d 292, 294 (Tenn. Ct. App. 1987), this court recognized the rule set out in *Choate v. Sewell*, 142 Tenn. 487, 221 S.W. 190 (1919), that "a parol gift of land coupled with an entry by the donee and adverse possession by him for more than seven years will vest with him a possessory or defensive right to the land." In *Walker*, we found the evidence to be inconsistent with either an absolute gift or an adverse holding, and affirmed the trial court's holding there was no enforceable gift.

The *Walker* opinion quoted extensively from *Mercy v. Miller*, 25 Tenn. App. 621, 166 S.W.2d 628 (1942), another case wherein this court found there was insufficient evidence to establish a gift under the *Choate v. Sewell* rule. In *Mercy v. Miller* this court observed:

> The opportunity and facility for fraud in setting up parol gifts, after the death of the alleged donor, make it the duty of a court to give close scrutiny to evidence offered to prove such a gift. . . . To sustain such a gift, the proof must be "ample, clear and convincing" as to every fact necessary to make out the gift.

*Id*. at 631 (citations omitted). The opinion also cited with approval *Atchley v. Rimmer*, 148 Tenn. 303, 255 S.W. 266 for the rule that "the unsupported testimony of the alleged donee ought not to be accepted as sufficient proof of a gift" and "a gift cannot be established by proof of declarations of the alleged donor alone."

In *Choate v. Sewell*, the seminal case for the rule relied on by appellees, a parol donee was determined to be comparable to a parol vendee. The court's holding is based upon the rule that a parol vendor, or donor, has the right to repudiate the sale or gift, and that right accrues immediately upon the making of the sale or gift. Where the vendee or donee enters into possession with the knowledge of the parol vendor or donor, "claiming adversely to him and all the world," the vendor or donor is precluded, after seven years of such adverse possession, from repudiating the oral sale or gift. 221 S.W. at 192-93. "Such adverse possession for seven years extinguishes the right of the

parol vendor to have an action, either at law or in equity to repudiate his conveyance of the lands."
*Id*. at 193.

It is clear that David's claim under the *Choate v. Sewell* holding must rest upon clear and convincing proof of a gift. Additionally, for purposes of determining whether seven years of adverse possession has occurred, the specific date or time frame of the gift must be shown. Further, there must be proof that David's possession was adverse to his father's title or interest. A review of David Garrett's own testimony and the other evidence presented at trial demonstrates that he has not met his burden as to any of these requirements.

In fact, it is David's own testimony which defeats the claim that he was given the house and land in the 1980s by way of any sort of gift; it also defeats any claim that he possessed the property adversely to his father's interest. David concedes that his father did not give him a deed to any land and that when he constructed the house and occupied it, he did so only with his father's permission. He testified as follows:

Q: How did you come to build your house on this 121-acre tract?
A: Well, to start with, I was just looking for a little cabin in the woods, a little hut or something to build, and I started mine like that. I didn't have anything else.
Q: Did you talk to your dad about this?
A: Well, I just said, if he didn't care, I would sort of squat, I guess.
Q: Did you have his consent?
A: Yes.

Later in his testimony, he stated his father had never spoken to him about deeding him seven acres, but testified:

Dad never did tell me exactly seven acres, no. He never did mention that to me. . . . the only time Dad ever made a reference to me about my place, [was] when he was real sick, almost to die . . . [I told dad] I just homesteaded and hope I get my place and dad raised up his head and he said, "You got it," like that. He never did tell me, I never did worry about the acreage up until he got sick and we knew he was dying.

In this case, it is not entirely clear when the gift was supposed to have been made, but appellees seem to have settled on sometime in the 1980s, on the basis that that is when David went into possession of the house.[6] David's testimony, however, contradicts any assertion that his father gave him the house in the 1980s since he stated that his father never made any reference to the house

---

[6]The original response filed by the five siblings alleged their father had given the house and seven acres to David in 1988 It could be argued that this theory was abandoned at trial, as the court stated, "The only issue [is] interpretation of this size of land awarded to Keith Garrett, is that the only issue?" to which appellee counsel responded, "That's all we see." Nonetheless, the trial court granted seven acres and a house to David, and appellees seek to uphold that ruling on the basis of an earlier parol gift.

13

until shortly before his death. In addition, there is absolutely no proof that the testator surrendered control over any real property surrounding David's house or that the testator intended to give David the house and any acreage at the time David moved into the house. For the reasons stated herein, we find the donee has failed by prove by clear and convincing evidence that the testator made a gift of land to him in the 1980s.

Finally, David argues that because the will contained a clause stating that the testator hoped that he raised his children to be fair and equitable, and because all of the appellee siblings had agreed that David would be entitled to the house and seven acres before the rest of the estate was divided, the court's order should be upheld because it is fair and equitable and what the testator would have wanted. We have no doubt that the siblings are convinced that their father wanted David to have his house and seven acres around it and that they are taking actions consistent with that belief. The role of the courts, however, is limited. As stated, above, a court may not read into a will that which is not there. The testator's hope that his children would agree on a fair and equitable distribution of his estate does not constitute a separate devise or bequest and does not authorize the children or the courts to re-write his will.[7]

Therefore, we reverse the trial court's order granting to David and Paula Garrett a separate seven acres and house in addition to David's interest in the residuary estate. Thus, the house built by David and any land around it are to be considered part of the residuary estate which is to be divided equally among the children according to the provisions of the will. This is not to say that David has no recourse to obtain the house he built; he may always request that part of his one-sixth portion of the residual estate include the home and land on which the home is located. Additionally, while the siblings are free, of course, to give their one-sixth interest in the house built by David and acreage surrounding it to David, the agreement of five of them cannot divest Keith of his one-sixth interest in the residuary estate.[8]

## IV. Motion for New Trial

Keith Garrett argues that the trial court erred in denying his motion for new trial or, alternatively, for relief from the order. That motion was made under Tennessee Rules of Civil Procedure 59 and 60[9] over fourteen months after entry of the order construing the will. The basis for

---

[7]We interpret the testator's precatory language to refer to the residuary estate and not to give authority to the children to decide how to divide his entire estate.

[8]This holding should not be interpreted as implying that Keith has any right to a specific parcel in the residuary estate or a portion of the land surrounding David's house. He is simply entitled to one-sixth of the residuary estate which is to be divided in equal and fair shares, with the will directing process for resolving disputes as to fairness.

(continued…)

the motion was that counsel had discovered witnesses to "contradict, rebut and establish the true intent of the testator at or near the time of his death" and that, because the appellees had presented evidence regarding testator's intent at the time of his death, Keith Garrett, the petitioner, should be given that opportunity. The motion contended that the evidence was not discovered until after the hearing, when the proposed witnesses heard of the court's decision, and that the evidence was relevant to key issues. The motion asked the trial court to grant a new hearing, on the issue decided over a year previously, asking the court to "grant a new trial in this cause on the issue of disposition of the real property of the decedent." The appellees opposed the motion on the ground it was untimely. The trial court denied the motion.

Keith Garrett was permitted to make an offer of proof, which included affidavits and live testimony. At the close of the hearing, the trial court declined to change its ruling on the basis of the offered testimony, stating it had already denied the motion for new trial.

Keith Garrett's motion was entirely designed to get the court to hear evidence from witnesses who were not called in the earlier hearing on the issue decided in that hearing. Essentially, it was a request that the court re-open an order, and the issues decided in that order, which had been entered over a year previously, on the basis of newly-discovered evidence.

Tenn. R. Civ. P. 59.02 states in pertinent part:

Time for Motions.--A motion for new trial and all other motions permitted under this rule shall be filed and served within thirty (30) days after judgment has been entered in accordance with Rule 58.

Obviously, the motion for new trial was not filed within thirty days of entry of the order construing the will. In addition, the evidence the motion sought to have the court consider was not newly-discovered evidence within the rule regarding new trial.

Another principle of law that is deeply ingrained in the holdings of our courts and has been repeated in the majority of the some 65 cases where our courts have addressed this issue is that to justify a new trial for newly discovered evidence it must be shown that the new evidence was not known to the moving party prior to or during trial and that it could not have been known to him through exercise of reasonable diligence.

*Seay v. City of Knoxville*, 654 S.W.2d 397, 399 (Tenn. Ct. App. 1983) (citations omitted). An affidavit in support of such a motion must set out the facts constituting due diligence with particularity. *Id.* Further, "in ruling on a motion for new trial on the grounds of newly discovered evidence the trial court is vested with wide discretion, and its denial of such a motion will not be

(...continued)

[9]On appeal, the appellant argues the issue only on the basis of Rule 59 grounds.

15

disturbed by an appellate court unless it has abused its discretion." *Evans v. Evans*, 558 S.W.2d 851, 853 (Tenn. Ct. App. 1977).

The trial court acted well within its discretion when it denied the motion for new trial which was filed many months after the entry of the order. In addition, having reviewed the affidavit and testimony offered in support of the motion for new trial, we find that the evidence Keith Garrett presented was not newly discovered evidence that could not have been discovered prior to or during the hearing through the exercise of due diligence.[10] We affirm the trial court's denial of the motion for new trial.

## V. The *In Terrorem* Clause

Keith Garrett argues that because his siblings challenged his interpretation of the will, the forfeiture clause was activated. He maintains that they should take nothing under the will. The siblings respond that the *in terrorem* clause has no effect because neither side is objecting to the probate. They also contend that forfeiture provisions are not enforceable when suits are pursued in good faith, relying on *Winningham v. Winningham*, 966 S.W.2d 48 (Tenn. 1998).

---

[10]One of the witnesses was Andrew Potter, the surveyor whom David said had created the survey referred to in the will. Mr. Potter denied that he had surveyed the testator's property by dividing it into seven acre tracts. He also stated his office had burned and his records had been destroyed. Most of the proposed testimony dealt with statements made by the testator, not at the time of the execution of the will, but much closer to his death. Kathy Gernt, who had worked with the testator at a chicken plant, testified that she and her husband visited the testator during his illness. After her husband commented about how much he liked the testator's house, the testator purportedly stated: "it was Keith's house, that Keith had built it . . . He said his house needed to be painted and I told him maybe we would get some commercial grade wallpaper and put it up . . . He said that he didn't know if Keith would like that." Mrs. Gernt's husband substantiated much of this testimony. The testimony of Billy Allen South, a neighbor, was also proffered in support of Keith's claim. Mr. South made a personal statement concerning the testator's last wishes:

> Gaston wished me to say to the Court that he wished that this matter of this Will be settled behind closed doors, the members that were all to be involved, and that he had written the Will and that the same lawyer that helped him word and prepare them and explain the Will and they had went over it word for word and that the Will would stand good for itself and that the records of properties or anything that was on record, everything was on record and that he felt between our discussions that the Will would stand good for itself and would not be problem of the Court to decide . . . I will have to state that Gaston's intentions of me as far as knowing of the Will which I stated he had named Keith and Pam. He intended for Keith to have that property. He intended it to be under control of Keith Garrett.

> When asked what specific property he was referring to, Mr. South stated, "the property that he lived on. He considered it – he named it as this property – the house that he lived in, he considered it to be all – all of the land that was there where he lived that was joining that tract that he lived on was one property."

> Keith also proffered the affidavits of two additional witnesses. Ben King attested that the testator had told him that "Keith was the only child that had ever done anything for me" and "the other children are only interested in what they can get from me." Pete Taylor attested that the testator said that his house would one day belong to Keith.

Tennessee courts recognize the validity of forfeiture provisions in wills. *Tate v. Camp*, 147 Tenn. 137, 149, 245 S.W. 839, 842 (1922) (finding that such provisions are not void as against public policy).

> However, it has been the rule since *Tate v. Camp,* that a forfeiture provision will not be enforced where a contest is pursued "in good faith and upon probable cause." After considering decisions from other jurisdictions, the Court in *Tate v. Camp* approved the following from *South Norwalk Trust Co. v. St. John*, 92 Conn. 168, 101 A. 961, 963 (1917), "Where the contest has not been made in good faith, and upon probable cause and reasonable justification, the forfeiture should be given full operative effect. Where the contrary appears, the legatee ought not to forfeit his legacy."

*Winningham*, 966 SW2d at 51.

It appears that the siblings commenced this action in good faith and upon probable cause. The record shows that they simply disagreed with Keith's desire to take the vast majority of his father's estate. There was obviously a valid question as to what the survey contained in light of the fact that the will referenced the document and it was never found. Additionally, they have prevailed at trial and on appeal on the size of the parcel bequeathed to Keith. Thus, the *in terrorem* clause was not triggered.[11]

## VI. Frivolous Appeal

The siblings argue that this appeal is frivolous and they are entitled to sanctions because Keith's position that he is entitled to all one hundred twenty one (121) acres is groundless. They seek costs and attorney fees pursuant to Tenn. Code Ann. § 27-1-122.[12] We cannot say that this appeal was totally lacking in merit, or taken for delay, so as to invoke the statutory penalty, particularly when we vacated the trial court's disposition giving David Garrett a separate tract.

## VII. Summary

---

[11]Keith Garrett's brief acknowledges that the in terrorem clause would only be triggered if the trial court's rulings were reversed.

[12]Tenn. Code Ann. § 27-1-122 provides:

When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

The trial court's decision to award Keith and Pamela Garrett a seven acre tract surrounding their homestead is affirmed.  We reverse the trial court's decision regarding the grant of a separate bequest of the home and seven (7) surrounding acres to David Garrett.  Next, we find the trial court did not abuse its discretion in denying Keith's motion for new trial and the trial court properly refused to apply the *in terrorem* clause.  Finally, we reject the appellees' request for sanctions. This cause is remanded to the trial court for further actions necessary not inconsistent with this opinion. Costs of this appeal are taxed equally to the appellant and the appellees, for which execution may issue, if necessary.

_____
PATRICIA J. COTTRELL, JUDGE